UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 04-30046-KPN

DiMAIO FAMILY PIZZA & LUNCHEONETTE, INC. and ANTHONY A. DiMAIO,
Plaintiffs,

v.

THE CHARTER OAK FIRE INSURANCE COMPANY,
Defendant.

**AFFIDAVIT OF THE PLAINTIFF, ANTHONY A. DiMAIO, IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The undersigned, Anthony A. DiMaio, states as follows:

1.    I am a plaintiff in the above-referenced litigation and, as such, I have personal

knowledge of the facts set forth here.

2.    I am also the treasurer and the secretary of the plaintiff, Dimaio Family Pizza

& Luncheonette, Inc. I and Dimaio Family Pizza & Luncheonette, Inc. conducted business

as Villa DiMaio Restaurant.

3.    At all times material, I owned real estate with a commercial restaurant

building situated thereon which was located at 268 State Road, Whatley, Massachusetts

(hereinafter "the Premises").

4.    At all times material from 1997, I and DiMaio Family Pizza & Luncheonette,

Inc. operated a restaurant business at and owned related business personal property

located on the Premises.

5.    On or about February 18, 2000, the defendant, Charter Oak Fire Insurance

Company, issued a Commercial Property Insurance Policy, being numbered I-660-

575X1693-COF-00 (hereinafter "the Policy"), which provided for all risk coverage for loss or damage to the Premises and to the business personal property thereon and for the loss of business income.

6.    The Policy provided coverage for the building on the Premises at replacement cost in the agreed value of $550,000, for the business personal property on the Premises at replacement cost in the agreed value of $250,000 and for loss of business income with extra expense in the amount of $120,000

7.    On or about December 18, 2000, while the Policy was in full force and effect, the Premises and the building and the related business personal property thereon were completely and entirely destroyed by fire.

8.    At the time of the fire, the plaintiff, DiMaio Family Pizza & Luncheonette, Inc., was in bankruptcy, having filed for bankruptcy under Chapter 11 of the Bankruptcy Code on or about February 25, 2000.

9.    On or about March 21, 2001, the bankruptcy case of DiMaio Family Pizza & Luncheonette, Inc., was converted to one under Chapter 7 of the Bankruptcy Code.

10.    Immediately after the fire, I gave notice of this fire to Charter Oak, together with notice of the related damage to the Premises and to the business personal property and of the related losses and expenses sustained (hereinafter "the Loss").

11.    Because of the bankruptcy of DiMaio Family Pizza & Luncheonette, Inc., I understood and believed that the claim for the Loss under the Policy was owned and would be made by the bankruptcy estate in the bankruptcy case.

12.    With the knowledge of the bankruptcy trustee, I, at the request of Charter Oak, rendered timely, proper, complete and accurate information and statements of loss to the best of my ability, since nearly all of the business records were destroyed in the Loss, and I fully cooperated to the best of my ability with the investigation of Charter Oak concerning the Loss, all in accordance with the terms of the Policy.

13.    From the date of the Loss to the present, I have made demand for replacement of the building and property destroyed in the Loss, and for payment under the Policy and for referral of the insurance claim to reference within the terms of the Policy.

14.    Because Charter Oak failed to replace the building and property destroyed in the Loss, and to make payment under the Policy on the insurance claim or proceed to reference within the terms of the Policy, I was compelled to file for bankruptcy under Chapter 7 of the Bankruptcy Code on or about December 27, 2001.

15.    Because of the bankruptcy of DiMaio Family Pizza & Luncheonette, Inc., and of my later bankruptcy, I understood and believed that the claim for the Loss under the Policy was owned and would be made by the bankruptcy trustees for the bankruptcy estates in the bankruptcy cases.

16.    From the date of the Loss to the present, I believed that the replacement cost of the building was in excess of the agreed value of coverage in the amount of $550,000, and that the replacement cost of the business personal property on the Premises was in excess of the agreed value of coverage in the amount of $250,000.

17.    My belief as to the replacement cost of the building and of the business personal property proved accurate and is reflected in the Appraisal Summary Report dated

February 15, 2001 which was prepared for Charter Oak by Fitzgerald & Company, Inc. This document, the relevant portions of which are attached and incorporated as Exhibit 1, was recently produced by Charter Oak in response to the plaintiffs' request for production in this litigation. From this document, it appears that the replacement cost of the building was $727,088 (Ex. 1, pg. 40-41) and that the replacement cost of the business personal property for a comparable restaurant was $300,000. (Ex. 1, pg. 49-50).

18.    I am informed that the first time that Charter Oak made an offer to pay the insurance claim was on or about April 5, 2002, nearly sixteen months after the Loss, when Charter Oak offered to pay the bankruptcy trustees its estimate of the actual cash value of the building in the amount of $275,000 and of the business personal property in the amount of $80,500.

19.    Shortly after the fire, the Town of Whately requested that I demolish the building and remove the destroyed property from the Premises. Because I had no funds, the Town of Whately undertook to demolish the building and removed the destroyed Property from the Premises. The Town made a claim against me for the demolition and debris removal and I became liable to the Town and made claim against Charter Oak for the cost thereof in the amount of $16,250. Charter Oak paid this amount to the Town with a $20,000 advance in a check made payable to Villa DiMaio Restaurant and the Town. Copies of related letters from the Franklin County Cooperative Inspection Program dated December 18, 2000 and January 25, 2001, from Charter Oak dated March 9, 2001, from C.R.D. Inc., Excavation Contractors, dated April 25, 2001, from Charter Oak dated March 19, 2002, from the Town dated April 8, 2002, and from Charter Oak

dated July 30, 2003, together with the Charter Oak Adjustment Summary dated September 22, 2003, are attached and incorporated as Exhibit 2.

20.    Charter Oak did not, at the time of making such advance payment, by notice in writing, inform me of the statute of limitations applicable the insurance claim arising from the Loss and the time within which an action was required to be commenced to enforce such a claim in a court of competent jurisdiction.

Signed under the penalties of perjury this 13th day of August, 2004.

Anthony A. DiMaio

## CERTIFICATE OF SERVICE

I, Mark J. Albano, Esq., hereby certify that a copy of the foregoing document was served on the following persons by first class mail, postage prepaid, on this the 13th day of August, 2004:

Gerald P. Dwyer, Jr.
Wystan M. Ackerman, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Mark J. Albano, Esq.



# COMPLETE APPRAISAL/SUMMARY REPORT

### VILLA DIMAIO RESTAURANT
### 268 STATE ROAD
### WHATELY, MASSACHUSETTS



### PREPARED FOR
MR. DAVID REED, GENERAL ADJUSTER
CLAIMS SERVICES
TRAVELERS INSURANCE
300 WINDSOR STREET
HARTFORD, CONNECTICUT 06120

### EFFECTIVE DATE OF VALUATION
### DECEMBER 18, 2000

### PREPARED BY
FITZGERALD & COMPANY, INC.
TOWER SQUARE - SUITE 1502
1500 MAIN STREET
SPRINGFIELD, MASSACHUSETTS 01115-5388

COF-00977

# FITZGERALD & COMPANY, INC.

Tower Square- Suite 1502
1500 Main Street
Springfield, Massachusetts  01115-5388

---

Tel. (413) 747-4100   Fax (413) 747-4109

February 15, 2001

Mr. David Reed, General Adjuster
Claims Services
Travelers Insurance
300 Windsor Street
Hartford, Connecticut 06120

Subject:    Villa DiMaio Restaurant
            268 State Road
            Whately, Massachusetts
            File #4769

Dear Mr. Reed:

At your request, we have provided to you an appraisal of property located at 268 State Road, in Whately, Massachusetts. The property consists of a 4.00 acre parcel of land that is improved with a one story restaurant containing 7,864 square feet. The property had been purchased by Salvatore and Anthony A. DiMaio in 1995 for $220,000 and then extensively remodeled.

On December 18, 2000 the property was completely destroyed by a fire such that the improvements are in need of either total reconstruction or demolition. The purpose of this report is to estimate the market value of the fee simple interest in the subject property prior to the aforementioned fire.

The function of the appraisal is to establish market value for a claim settlement. The effective date of this appraisal is the day of the fire, December 18, 2000.

As a result of our inspection, market research, and analysis of the property, it is our opinion that as of December 18, 2000, the market value of the subject property was as follows:

**THREE HUNDRED THOUSAND DOLLARS**
**$300,000**

Real Estate Appraisers and Consultants

COF-00978

Mr. David Reed
Page 2
February 15, 2001


It is important to note that the $300,000 estimate of value does not include the value of furniture, fixtures and equipment. We have decided to place a value range on these items as their value can differ depending on the owners perspective versus a market perspective. Thus we present a value for the furniture, fixtures and equipment of $80,000.

**VALUE OF**
**FURNITURE, FIXTURES & EQUIPMENT**
**$80,000**

We have also considered an appropriate marketing period for a property of this type. Based on the data collected, it is our opinion that if this property were to be marketed at a reasonable price, geared toward a final sale around $300,000 the marketing period would approximate 12 months.

Thank you for contacting our firm for this assignment. If you have any questions concerning our valuation and analysis, please contact us at (413) 747-4100.

Very truly yours,

Brian J. Fitzgerald, MAI
Massachusetts Certified
General Real Estate Appraiser #499


Joseph A. Barbieri
Massachusetts Certified
General Real Estate Appraiser #2196

BJF:jab

COF-00979

# TABLE OF CONTENTS

Letter of Transmittal
Summary of Salient Facts and Conclusions     1
Subject Photos     2
Identification of the Property     6
Purpose/Function of the Appraisal     6
Property Rights Being Appraised     6
Effective Date of the Appraisal     6
Scope of the Appraisal     7
Market Value Defined     7
Region/Town Data     8
Neighborhood Data     14
Description of Site     16
Zoning Data     19
Description of Improvements     20
Assessed Value     23
Sales History     23
Highest and Best Use     24
Valuation Methodology     25
Sales Comparison Approach     25
Cost Approach to Value     38
Income Approach to Value     42
Reconciliation and Final Value Estimate     48
Value of Furniture, Fixtures and Equipment     49

**Addenda**
Legal Description
Flood Plan Map
Contingent and Limiting Conditions
Certification
Qualifications of the Appraiser

COF-00980

## Valuation of the Improvements

Valuation of the improvements has been estimated on the basis of reproduction cost. To determine the cost of reproducing the existing improvements, we have used Marshall Valuation Service as a source, and we have had discussions with contractors familiar in the design/construction of similar buildings.

In Marshall Valuation Service, the base cost for a restaurant, Class C/D, average quality the base cost is $71.89 per square foot of building. Adjustments were then made for story height (1.00), perimeter (1.05), current (1.01) and local multipliers (1.05). The adjusted base cost is $80.05 per square foot of building.

In addition to direct costs, we have included consideration of indirect or soft costs and entrepreneurial profit. Indirect Costs are defined as expenditures or allowances that are necessary or construction but are not typically part of the construction contract. In the local market indirect costs can range from 5% to 10% of total. Based on market data, we have estimated total indirect costs at 5% of direct costs.

Entrepreneurial Profit is defined as a market derived figure that reflects the amount an entrepreneur expects to receive. This profit is estimated as a percentage of direct and indirect costs and typically range from 10% to 25% of direct and indirect costs. We have estimated entrepreneurial profit at 10% of direct and indirect costs.

## Depreciation

The next step in the Cost Approach involves estimating accrued depreciation. The economic age-life method will be used to estimate accrued depreciation from all causes. This is a ratio of a building's effective age to total economic life is applied to the current cost of the improvements. The effective age accounts for any physical deterioration, functional obsolescence (based on design) and external obsolescence.

According to life expectancy tables in Marshall Valuation Service, buildings of this type have a typical total economic life of 35 years. According to assessors records, the original building was constructed in 1953 with the most recent modernization in the late 1990's. Accounting for physical depreciation, functional and economic obsolescence, the effective age estimated at 20 years. Based on an effective age of 20 years and a total economic life of 35 years, the accrued depreciation is estimated at 57%.

Site improvements are estimated to have a total economic life of 10 years and an estimated effective age of 5 years, indicating an overall site improvement depreciation of 50%.

**Source: Marshall Valuation Service**

Section 13, Page 14 - Restaurants
Average Quality

| Reproduction Cost New | |
|---|---|
| 7,864 sf @ $80.05/sf | $629,513 |
| Plus Indirect Costs @ 5% | $31,476 |
| Subtotal | $660,989 |
| Plus Entrepreneurial Profit @ 10% | $66,099 |
| Reproduction Cost New | $727,088 |
| **Age Life Method of Depreciation** | |
| Effective Age @ 20 Years | |
| Total Economic Life @ 35 Years | |
| Total Accrued Depreciation @ 57% | (-$414,440) |
| Reproduction Cost Depreciated | $312,648 |
| **Site Improvements** | |
| Site Improvements: 4 Acres @ $7,500 Per Acre | $30,000 |
| Estimated Accrued Depreciation @ 50% | (-$15,000) |
| Subtotal Site Improvements | $15,000 |
| **Depreciated Value of the Building/Site Improvements** | $327,648 |
| Value of Land | $50,000 |
| Total Value | $377,648 |
| Rounded | $375,000 |

**THREE HUNDRED SEVENTY FIVE THOUSAND DOLLARS**
**$375,000**

COF-01021

## The Value of the Furniture, Fixtures and Equipment (FF&E)

There are tables, chairs and booths for the operation of a 350 person restaurant/banquet facility. The furniture, fixtures and equipment are not part of the real estate and have been valued separately at the end of this report. There were reported to be walk-in coolers, sliding top freezers and baking ovens, stoves, storage racks and food preparation areas, ice machines, cooking and storage equipment.

The current owner stated in 1995 that he would initially use the furniture and some of the existing kitchen equipment which included a four-burner gas stove/griddle, three oven/broilers, an exhaust hood, refrigerators, coolers, ice chest, beer taps, and stainless steel prep tables. Additionally, there is tableware, kitchenware and linens. In order to estimate the contributory value of the FF&E, we have reviewed the following data.

| Supporting Data for FF&E | | | | |
|---|---|---|---|---|
| Location | Value of FF&E | SF | $/SF | Remarks |
| 238 Northampton Street Easthampton, MA | $140,000 | 12,495 | $11.20 | Buyer paid $160,000 for the FF&E, business & license in 1996. The restaurant had changed names several times, and business value was nominal. The Easthampton license had an estimated value of $20,000 per seller and the restaurant was in operation at the time of F,F& E transaction. This is the highest figure as the seller has leverage over an existing lessee and continued restaurant operation. |
| Memorial Drive West Springfield, MA | $40,000 | 3,600 | $11.00 | This 3,600 sf former Burger Chef restaurant sold for $500,000 in March 1990. After the sale, the buyer sold the FF&E and recouped $40,000 or $11.11/sf of building area. This was not a distressed sale. |
| Route 15 Sturbridge, MA | $300,000 | 5,807 | $51.66 | This is the package for new equipment for a fast food restaurant with the capacity to seat 155 people, including plumbing, electrical and counter work. |
| East Main Street Westfield, MA | $150,000 | 2,728 | $54.99 | This is the package for new equipment for a fast food restaurant with the capacity to seat 88 people. |

The first two restaurants represent the value of the F,F, & E, one to an existing operation and from a buyer who actively marketed the equipment. The second two restaurants represent a value of a new F, F & E package.

Page # 49

COF-01029

The value of the subject's F,F&E would be based on its potential value in the market, which is lower than cost new. In the marketplace cost and value are not in economic equilibrium.

Based on conversations with auctioneers and appraisers of FF&E, a liquidation sale of the FF&E bring a percentage of total costs, often between $0.10 to $0.50 on the $1.00 of original cost. Higher values are obtained from dealers or as an on-going restaurant use.

Based on the above information, we have chosen to estimate the value of the F,F&E on a per square foot basis. This unit of measurement may be more reliable given that we do not have a definitive list of the subjects fixture and equipment, but know the size and general seating capacity. We the estimate the contributory value of the FF&E to be $10 per square foot of restaurant area.

Then: 7,864 sf @ $10 = $78,640; rounded to $80,000. The estimated value for the subject FF&E was:

**EIGHTY THOUSAND DOLLARS**
**$80,000**

COF-01030